# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| DANIEL FRANCISCO, ORI KATZIN, and FIREARMS POLICY COALITION, INC., <br><br> Plaintiffs, <br><br> -against- <br><br> PETER S. COOKE, JR., in his official capacity as Chief of Police of the Borough of Englishtown Police Department, WILLIAM WICKER, in his official capacity as Chief of Police of the Borough of Oradell Police Department, ANDREW J. BRUCK, in his official capacity as Acting Attorney General of New Jersey, and PATRICK J. CALLAHAN, in his official capacity as Superintendent of the New Jersey State Police, LOURDES LUCAS, in her official capacity as a Judge of the Monmouth County Superior Court, and CHRISTOPHER R. KAZLAU, in his official capacity as a Judge of the Bergen County Superior Court, <br><br> Defendants. | Case No. 3:21-cv-14575 <br><br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Edward A. Paltzik
Joshpe Mooney Paltzik LLP
1407 Broadway, Suite 4002
New York, NY 10018
Tel: (212) 344-8211
epaltzik@jmpllp.com
*Attorneys for Plaintiffs*

## <u>LOCAL CIVIL RULE 10.1 STATEMENT</u>

The street and/or post office addresses of the parties to this action are:

Daniel Francisco
7 Harrison Avenue
Englishtown, NJ 07726

Ori Katzin
192 Laurel Drive
Oradell, NJ 07649

Firearms Policy Coalition, Inc.
5550 Painted Mirage Road, Suite 320
Las Vegas, NV 89149

Peter S. Cooke, Jr.
Borough of Englishtown Police Department
15 Main Street
Englishtown, NJ 07726-1544

William Wicker
Borough of Oradell Police Department
355 Kinderkamack Road
Oradell, NJ 07649

Andrew J. Bruck
Acting Attorney General of New Jersey
Office of the Attorney General
RJ Hughes Justice Complex
Trenton, NJ 08625-0080

Patrick J. Callahan
Superintendent of the New Jersey State Police
P.O. Box 7068
West Trenton, NJ 08627

Lourdes Lucas
Judge of the Monmouth County Superior Court
71 Monument Park, 2nd Floor
Freehold, NJ 07728

Christopher R. Kazlau
Judge of the Bergen County Superior Court
10 Main Street, Room 306
Hackensack, NJ 07601

Plaintiffs DANIEL FRANCISCO ("Francisco"), ORI KATZIN ("Katzin"), and FIREARMS POLICY COALITION, INC. ("FPC"), (collectively, "Plaintiffs"), by and through counsel of record, bring this Complaint against Defendants Peter S. Cooke, Jr., in his official capacity as Chief of Police of the Borough of Englishtown Police Department ("Cooke"), William Wicker, in his official capacity as Chief of Police of the Borough of Oradell ("Wicker"), Andrew J. Bruck, in his official capacity as Acting Attorney General of New Jersey ("Bruck"), Patrick J. Callahan, in his official capacity as Superintendent of the New Jersey State Police ("Callahan"), Lourdes Lucas, in her official capacity as Judge of the Monmouth County Superior Court ("Judge Lucas"), and Christopher R. Kazlau, in his official capacity as Judge of the Bergen County Superior Court ("Judge Kazlau"), and allege as follows:

## **INTRODUCTION**

1.     Plaintiffs Francisco, Katzin, and indeed all individuals who are legally eligible to possess and acquire firearms, have a fundamental, constitutionally guaranteed right to carry loaded, operable handguns on their person and outside their homes, including in their vehicles, places of business, and otherwise in public, for the purpose of self-defense.

2.     But the State of New Jersey has criminalized the carry of handguns by subjecting those who unlawfully do so—even if by an otherwise law-abiding person

who carries a handgun to exercise their fundamental right to bear arms in public for self-defense—to punishment for a crime of the second degree, N.J.S.A. § 2C:39-5(b), a serious felony—placing such conduct among crimes for aggravated assault resulting in serious bodily injury, aggravated arson, robbery, and sexual assault.

3.      Adding further insult to constitutional injury, should an unlicensed person be convicted for exercising his rights by carrying a handgun in public, he would lose his Second Amendment rights under state and federal law. *See e.g.*, N.J.S.A.§ 2C:39-7; 18 U.S.C. § 922(g).

4.      The State's few exceptions to this broad criminal statute do not allow law-abiding citizens to carry a handgun outside their home. N.J.S.A. § 2C:39-6(e)-(g). Indeed, the law sweeps so broadly that it bars anyone from having a handgun in their "possession" unless they can show that they fall into one of the limited exemptions provided in a parallel statute. *See id.* §§ 2C:39-5(b), 2C:39-6(e)-(g).

5.      On the other hand, if one can obtain a New Jersey handgun carry permit under N.J.S.A. § 2C:58-4 (a "carry permit"), he or she can carry handguns outside the home. "Any person who holds a valid permit to carry a handgun issued pursuant to [N.J.S.A § 2C:58-4] shall be authorized to carry a handgun in all parts of this State, except as prohibited by subsection e" of N.J.S.A. § 2C:39-5. N.J.S.A. § 2C:58-4.

6.      And "[o]ne [carry] permit shall be sufficient for all handguns owned

by the holder thereof, but the permit shall apply only to a handgun carried by the actual and legal holder of the permit." *Id*.

7.    But to obtain a carry permit, a private citizen must apply to either their chief police officer or to the state police superintendent, depending upon their circumstances, as required by N.J.S.A § 2C:58-4(c).

8.    This police official has the discretion determine whether the requirements, including "justifiable need, have been met, and to approve or disapprove the application accordingly. N.J.S.A. § 2C:58-4(c).

9.    And that "justifiable need" requirement—conditioning the issuance of a permit to carry a handgun on proof of an "urgent necessity for self-protection, as evidenced by specific threats or previous attacks which demonstrate a special danger to the applicant's life that cannot be avoided by means other than by issuance of a permit to carry a handgun," N.J.S.A. § 2C:58-4(c)—statutorily disqualifies all ordinary law-abiding citizens, preventing them from obtaining a carry permit.

10.    The State of New Jersey's laws, regulations, policies, practices, and customs individually and collectively deny millions of individuals who reside in New Jersey, like Francisco and Katzin, FPC's other members and supporters, and others like them, their  fundamental, individual right to bear loaded, operable handguns outside the home through oppressive criminal statutes combined with a

carry permit system that requires "justifiable need" and other subjective requirements that regular citizens cannot meet (the "Regulatory Scheme").[1]

11.     Consequently, because of the Regulatory Scheme and Defendants' enforcement of it, neither Francisco or Katzin, FPC's other members and supporters, nor any other ordinary law-abiding adult can exercise their fundamental right to bear arms in New Jersey without being subject to severe criminal sanction.

12.     To be sure, Plaintiffs acknowledge that the result they seek is at least in part contrary to the Third Circuit's decision in *Drake v. Filko*, 724 F. 3d 426 (3d Cir. 2013), but that case was wrongly decided. They therefore institute this litigation in good faith to vindicate their Second Amendment rights, to seek to have *Drake* overruled, and to conform New Jersey's laws, policies, practices, and customs to the constitutional standards set forth in the Constitution's text, and as the Supreme Court has elucidated in *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. City of Chicago*, 561 U.S. 742 (2010). Additionally, during its October 2021 Term, the Supreme Court will hear arguments in the matter of *New York Rifle & Pistol Association, Inc., et al. v. Kevin P. Bruen*, *In His Official Capacity as Superintendent of New York State Police, et al.*, No. 20-843, in which the Court will decide the question: "Whether the Second Amendment allows the government to prohibit ordinary law-abiding citizens from carrying handguns

---

[1] The "Regulatory Scheme" specifically refers to N.J.S.A. §§ 2C:39-5(b), 2C:39-6, 2C:58-3(c)(5), 2C:58-4(a)-(f), 2C:43-3(a)(2), 2C:43-6(a)(2), and N.J.A.C. §§ 13:54-2.2, 13:54-2.3, 13:54-2.4(a)-(f), 13:54-2.5, 13:54-2.6, 13:54-

outside the home for self-defense."

13.    The Second and Fourteenth Amendments do not merely protect home-bound rights. And because the right to keep and bear arms is not a "second-class right" to be "singled out for special—and especially unfavorable—treatment", *McDonald*, 561 U.S. at 778–79, 780, Plaintiffs bring this case to challenge the State of New Jersey's Regulatory Scheme, and the Defendants' actual and threatened enforcement of the same, which should and must, under the text of the Constitution, our Nation's history and tradition, and the Supreme Court's precedents, be declared unconstitutional and enjoined so that Plaintiffs and law-abiding individuals like them can exercise their constitutional right to bear arms—both inside and outside of their homes.

## JURISDICTION & VENUE

14.    This Court has jurisdiction over all claims for relief pursuant to 28 U.S.C. §§ 1331, 1343, 2201, and 2202, and 42 U.S.C. §§ 1983 and 1988, as this action seeks to redress the deprivation, under color of the laws, statutes, ordinances, regulations, customs, and usages of the State of New Jersey, of the rights, privileges, or immunities secured by the United States Constitution. To the extent Plaintiffs' claims may allege or may be construed to allege state law claims, this Court has supplemental jurisdiction under 28 U.S.C. § 1367(a).

15.    Venue is proper in this Court under 28 U.S.C. §§ 1391(b)(1) and (b)(2),

as the Defendants are all residents of New Jersey, in which this District is located, and the events giving rise to Plaintiffs' claims arose or exist in this District.

## PARTIES

16.   Plaintiff Francisco is a natural person; a resident of Englishtown, Monmouth County, New Jersey; an adult over the age of 21; a citizen of the United States; and legally eligible under federal and state law to possess and acquire firearms. Francisco is a duly elected member of the Englishtown Borough Council and, as part of his official Council duties, is a member of the Englishtown Borough Police Committee. Francisco is a member and supporter of FPC.

17.   Plaintiff Katzin is a natural person; a resident of Oradell, in Bergen County, New Jersey; together with his wife, Ronit Katzin ("Ronit"), is the co-owner of a business known as Interior Art & Design, Inc., which produces custom drapes and shades, located at 59 Oak Street, Hackensack, Bergen County, New Jersey; an adult over the age of 21; a citizen of the United States; and legally eligible under federal and state law to possess and acquire firearms.  Katzin, who was born in Israel, served in the Israeli Defense Forces ("IDF") from 1980-1983, culminating in an honorable discharge. His service in the IDF included over one year as a tank commander; and, as a member of the IDF, he completed extensive military firearms training. Additionally, Katzin has undergone extensive civilian firearms training and is a National Rifle Association ("NRA")-certified instructor,

pistol instructor, and Range Safety Officer. Katzin is a member and supporter of FPC.

18.   Plaintiff FPC is a nonprofit organization incorporated under the laws of Delaware with a place of business in Clark County, Nevada. The purposes of FPC include defending and promoting the People's rights, especially but not limited to the Second Amendment right to keep and bear arms, advancing individual liberty, and restoring freedom. FPC serves its members, supporters and the public through legislative advocacy, grassroots advocacy, litigation and legal efforts, research, education, outreach, and other programs. FPC brings this action on behalf of itself, its members, supporters who possess all the indicia of membership, and similarly situated members of the public who seek to exercise their right to carry firearms outside their homes, such as in vehicles, places of business, and other places in public, for self-defense.

19.   Defendant Cooke is Chief of Police of the Borough of Englishtown Police Department (the "EPD"), in Monmouth County, New Jersey. In such capacity, Cooke executes and administers the State's laws, including the Regulatory Scheme and the related regulations, policies, practices, and customs designed to enforce and  implement the same, including its criminal laws on carriage of handguns in public, and the acceptance, processing, and approval or denial of applications for permits to carry a handgun filed by residents of

Englishtown, including the application of Francisco. Cooke is therefore responsible for determining whether each such private citizen applicant has satisfied the statutory requirements for a carry permit, including whether the applicant has demonstrated a "justifiable need" within the meaning of N.J.S.A. § 2C:58-4(c), N.J.A.C. § 13:54-2.3(a), and N.J.A.C. § 13:54–2.4(d)(1), and for approving or denying the applications. Cooke has enforced and continues to enforce the "justifiable need" requirement against Francisco and other similarly situated individuals in Englishtown, resulting in their ongoing inability to obtain a permit to carry handguns. Cooke is sued in his official capacity.

20.   Defendant Wicker is Chief of Police of the Borough of Oradell Police Department (the "OPD"), in Bergen County, New Jersey. In such capacity, Wicker executes and administers the State's laws, including the Regulatory Scheme and the related regulations, policies, practices, and customs designed to enforce and implement the same, including its criminal laws on carriage of handguns in public, and the acceptance, processing, and approval or denial of applications for permits to carry a handgun filed by residents of Oradell, including the application of Katzin. Wicker is therefore responsible for determining whether each such private citizen applicant has satisfied the statutory requirements for a carry permit, including whether the applicant has demonstrated a "justifiable need" within the meaning of N.J.S.A. § 2C:58-4(c), N.J.A.C. § 13:54-2.3(a), and N.J.A.C. §13:54-

2.4(d)(1), and for approving or denying the applications. Wicker has enforced and continues to enforce the "justifiable need" requirement against Katzin and other similarly situated individuals in Oradell, resulting in their ongoing inability to obtain a permit to carry guns.  Wicker is sued in his official capacity.

21.    Defendant Bruck is the Acting Attorney General of the State of New Jersey. In such capacity, Bruck is the head of the State's Office of the Attorney General (the "OAG") and Department of Law and Public Safety, which includes the New Jersey State Police (the "NJSP"), and holds statewide criminal jurisdiction to investigate and prosecute any indictable offense; he is therefore responsible for executing, delegating, or supervising the laws and regulations of the Regulatory Scheme which govern the carrying of firearms in public and impose criminal sanctions for violations of the same. N.J.S.A. § 52:17B-108.  Bruck is sued in his official capacity.

22.    Defendant Callahan holds the rank of Superintendent in the NJSP. Callahan is the executive and administrative head of the Division of the NJSP, responsible for exercising, delegating, or supervising the powers and duties of that Division under the general supervision and  oversight of Bruck. N.J.S.A. § 52:17B-7. In such capacity, Callahan is charged with executing and enforcing the State's criminal laws, including the laws and regulations of the Regulatory Scheme which govern the carrying of firearms in public and impose criminal sanctions for

violations of the same. Callahan is sued in his official capacity.

23.    Defendant, Judge Lucas, was at all times relevant to this action, and still is, a Judge of the Monmouth County Superior Court, State of New Jersey. Judge Lucas is sued in her official capacity. As set forth *infra*, Judge Lucas was assigned to hear Francisco's appeal from Cooke's denial of Francisco's application for a carry permit, and upheld Cooke's decision.  Pursuant to N.J.S.A. § 2C:58-4(d), Judge Lucas, at all times relevant to this action, was vested with the ultimate authority to issue a permit to carry a handgun to an applicant, irrespective of whether the application was initially approved or denied by a local police chief or the Superintendent of the NJSP. Accordingly, Plaintiffs respectfully submit that Judge Lucas's determinations relevant to this action were not judicial in nature and should not be subject to any form of judicial immunity; rather, because the complex process for obtaining a carry permit enacted by New Jersey's lawmakers renders the administrative determinations of local police chiefs or the Superintendent of the NJSP with respect to applications for carry permits merely advisory and non-binding, and vests the Superior Court with the ultimate authority to issue carry permits (an authority that is administrative in nature), Judge Lucas's decision to deny Francisco's carry permit was a discretionary administrative act, and not a judicial act.  Indeed, even if Cooke had decided to approve Francisco's application for a carry permit, Cooke's decision would have been non-binding and

non-final, and the authority to issue the binding, final administrative decision still would have belonged to Judge Lucas, effectively requiring Judge Lucas to carry out an administrative function.

24.    Defendant, Judge Kazlau, was at all times relevant to this action, and still is, a Judge of the Bergen County Superior Court, State of New Jersey.  Judge Kazlau is sued in his official capacity. As set forth *infra*, Judge Kazlau was assigned to hear Katzin's appeal from Wicker's denial of Katzin's application for a carry permit, and upheld Wicker's decision.  Pursuant to N.J.S.A. § 2C:58-4(d), Judge Kazlau, at all times relevant to this action, was vested with the ultimate authority to issue a permit to carry a handgun to an applicant, irrespective of whether the application was initially approved or denied by a local police chief or the Superintendent of the NJSP. Accordingly, Plaintiffs respectfully submit that Judge Kazlau's determinations relevant to this action were not judicial in nature and should not be subject to any form of judicial immunity; rather, because the complex process for obtaining a carry permit enacted by New Jersey's lawmakers renders the administrative determinations of local police chiefs or the Superintendent of the NJSP with respect to applications for carry permits merely advisory and non-binding, and vests the Superior Court with the ultimate authority to issue carry permits (an authority that is administrative in nature), Judge Kazlau's decision to deny Katzin's carry permit was a discretionary administrative act, and

not a judicial act. Indeed, even if Wicker had decided to approve Katzin's application for a carry permit, Wicker's decision would have been non-binding and non-final, and the authority to issue the binding, final administrative decision still would have belonged to Judge Kazlau, effectively requiring Judge Kazlau to carry out an administrative function.

## NEW JERSEY'S UNCONSTITUTIONAL REGULATORY SCHEME

25.    In the State of New Jersey, any ordinary citizen who knowingly has in his or her possession any handgun without first having obtained a permit to carry the same is guilty of a crime in the second degree.[2] N.J.S.A. § 2C:39-5(b).

26.    This general prohibition against carrying a handgun without a permit applies to everyone except those who fall within one of the specifically exempted categories of people, primarily on-duty military personnel, law enforcement officers, and some other government officials. *See* N.J.S.A. § 2C:39-6(a)-(c), (l).

27.    Ordinary citizens, who do not have a carry permit, can only possess handguns in their homes or places of business, or while traveling to and from target practicing and then only when the handgun is both unloaded and locked in a container throughout the entire transit. N.J.S.A. § 2C:39-6(f)-(g).

28.    Travel while in possession of handguns to and from target practicing,

---

[2] If the propelling force of the handgun is compressed gas, vapor, or air (e.g., apellet or BB gun), the crime is in the third degree. N.J.S.A. § 2C:39-5(b)(2).

when the handgun is both unloaded and locked in a container throughout the entire transit, does not allow normal, everyday citizens to carry on their person loaded, operable handguns in public for lawful purposes including self-defense, and accordingly does not satisfy the right to bear arms.

29.    For the average citizen to qualify for a carry permit, in addition to being free of any history of crime, mental health problems, or drug abuse, etc. (N.J.S.A. §§ 2C:58-3(c), 2C:58-4(c); N.J.A.C. §§ 13:54-2.3(a), 13:54-2.4(a)-(d)), he or she must satisfy several other criteria, including: 1) having three other people attest to the applicant's "good moral character and behavior," N.J.S.A. § 2C:58-4(b); N.J.A.C.§§ 13:54-2.3(a), 13:54-2.4(a); 2) demonstrating "thorough familiarity with the safe handling and use of handguns" through specified forms of certification, N.J.S.A.§ 2C:58-4(c); N.J.A.C. § 13:54-2.4(b); and, 3) providing "a written certification of justifiable need to carry a handgun," N.J.S.A. § 2C:58-4(c); N.J.A.C. §§ 13:54- 2.3(a), 13:54-2.4(d)(1).

30.    The application for a handgun carry permit must be submitted to the chief police officer of the municipality in which the applicant resides or to the Superintendent of the NJSP if no local police department exists in the  applicant's town of residence. N.J.S.A. § 2C:58-4(c).

31.    "If the application is not approved by the chief police officer or the superintendent within 60 days of filing, it shall be deemed to have been approved .

. . ." *Id*.

32.     If, and only if, an application is approved by the applicable chief police officer or by the Superintendent, the applicant must then present the approval to the Superior Court of the county in which the applicant resides (or where he or she intends to carry the handgun if the applicant is a nonresident or an employee of an armored car company). N.J.S.A. § 2C:58-4(d).

33.     Pursuant to N.J.S.A. § 2C:58-4(d), the Superior Court may issue the permit only if it independently finds all the statutory requirements satisfied based on its own judgment: "The court shall  issue the permit to the applicant if, *but only if*, it is satisfied that the applicant is a person of good character who is not subject to any of the disabilities set forth in subsection c. of N.J.S.A. § 2C:58-3, that he is thoroughly familiar with the safe handling and use of handguns, and that he has a justifiable need to carry a handgun in accordance with the provisions of subsection c. of this section." *Id.* (italics added).

34.     A difference of opinion is not only a distinct possibility given the breadth of discretion inherent in the Regulatory Scheme, it actually happens. *See e.g., In re Calstrom*, 240 N.J. 563, 564 (2020) ("The Roselle Park Police Department approved petitioner Calvin Carlstrom's application to carry a handgun in his capacity as a security guard for AMC Movie Theaters, but the Superior Court, Law Division then denied his application without a hearing.").

35.     If the Chief of Police or the Superintendent deny an application, then the applicant may request a hearing before the Superior Court within the 30 days of the denial. N.J.S.A. § 2C:58-4(e).

36.     A hearing shall be held within 30 days of such a request, and "the determination at the hearing shall be in accordance with law and rules governing the courts of this State." *Id.*

37.     If the application is initially approved by the Chief of Police or the Superintendent, but the Superior Court refuses to issue a permit based on its own findings, "the applicant may appeal the denial in accordance with law and rules governing the courts of this State." *Id.*

38.     Thus, irrespective of whether the local police chief or the Superintendent of the NJSP approves or denies an application for a permit to carry a handgun, the ultimate authority to issue a permit to carry a handgun rests with Superior Court judges.  N.J.S.A. § 2C:58-4(d).  Accordingly, Plaintiffs respectfully submit that determinations made by Superior Court judges with respect to carry permit applications should be treated as discretionary administrative acts and not as judicial acts.  Since the administrative determinations of local police chiefs of the Superintendent of the NJSP with respect to carry permit applications are non-binding and non-final, the ultimate administrative function in this context is outsourced to Superior Court judges, who make binding administrative

determinations that are typically the province of law enforcement officials.  In this way, New Jersey's lawmakers have created a bizarre system in which judges are required to perform an administrative, rather than judicial function. *See e.g., Gallas v. Supreme Court*, 211 F.3d 760 (3d Cir. 2000) (quoting *Forrester v. White*, 484 U.S. 219, 227 (1988) ("Our task is to 'draw the line between truly judicial acts, for which immunity is appropriate, and acts that simply happen to have been done by judges,' such as administrative acts.").

39.    As well, the "law and rules" governing the approval and denial of such applications at each stage of the process—from the initial determination and up through any determination on appeal—necessarily include the fundamental condition that the applicant prove a "justifiable need" within the meaning of state law, failing which the application must be denied. As defined within the statutory scheme, "a justifiable need" can only be established, and therefore a carry permit may only be issued, under a very restrictive set of circumstances.

40.    To meet the State's "justifiable need" standard, all private citizens, like Francisco and Katzin, must "specify in detail the urgent necessity for self-protection, as evidenced by specific threats or previous attacks which demonstrate a special danger to the applicant's life that cannot be avoided by means other than by  issuance of a permit to carry a handgun." N.J.A.C. § 13:54-2.4(d)(1).

41.    Additionally, "[w]here possible the applicant shall corroborate the

existence of any specific threats or previous attacks by reference to reports of such incidents to the appropriate law enforcement agencies." *Id.*[3]

42.     Thus, even if the applicant can satisfactorily prove he or she faces such a "special danger," so long the police chief and/or the Superior Court surmises the existence of *any* other means by which the applicant *could* avoid that danger (e.g., hiring a security detail, relying on a 9-1-1 call to dispatch an instantaneous rescue, or simply trying to elude the attacker in some way), the application can—and presumably *must*—be denied.[4]

43.     This justifiable need condition is as onerous and strictly applied as it sounds: "Regardless of training and absence of a disqualifying condition, a well-trained and wholly law-abiding and responsible person cannot lawfully carry a firearm in a public place unless that person can demonstrate that he or she has 'a justifiable need to carry a handgun.'" *In re Wheeler*, 433 N.J. Super. 560, 579 (App. Div. 2013) (quoting N.J.S.A. § 2C:58–4(d)).

44.     And this standard ultimately means no permit will issue unless the applicant has "a reason—one based on more than a generalized concern about the

---

[3] This Regulatory Scheme even demands that private detective agencies, armoredcar companies, and private security companies, whose "statutorily authorized duties" subject them to "a substantial threat of serious bodily harm" must bear theadditional burden of proving that carrying a handgun "is necessary to reduce the threat of unjustifiable serious bodily harm to any person." N.J.A.C. § 13:54- 2.4(d)(2).
[4] Perhaps hiring a security detail to deal with the dangers of regularly traversing high-crime areas would be affordable to a business owner whose revenue exceeds $12 million a year, *see In re Pantano*, 429 N.J. Super. 478, 484 (App. Div. 2013)(refusing to disturb the denial of Pantano's carry permit application because he "presented no evidence that his business, which grossed over $12 million a year, could not reasonably afford protective service"), but such measures are far out ofreach for the ordinary citizen.

prevalence of crime—to anticipate a violent attack in a public place warranting

lawful defensive use of a handgun," *id*. at 579, backed up by "evidence of specific

threats or previous attacks" demonstrating he or she faces a "special danger" absent

the carry permit, N.J.S.A. § 2C:58-4(c). This has been the settled law in New Jersey

since at least 1971. At that time, the statutory scheme said nothing more than that

the applicant was required to demonstrate a "need" for the carry permit, with no

definition of "need."

45.     Yet, the New Jersey Supreme Court strictly construed this "need"

requirement even then, saying the requirement "wisely confines the issuance of

carrying permits" to those "who can establish an urgent necessity for carrying guns

for self-protection. One whose life is in real danger, as evidenced by serious threats

or earlier attacks, may perhaps qualify within the latter category but one whose

concern is with the safety of his property, protectible by other means, clearly may

not so qualify." *Siccardi v. State*, 59 N.J. 545, 557 (1971); *accord In re Preis*, 118

N.J. 564, 572 (1990).

46.     Thus, under New Jersey's Regulatory Scheme, to determine whether

someone should be entitled to armed self-defense, the government must weigh

whether: (1) self-protection is necessary; (2) the need is urgent; (3) the danger is

special; and (4) no alternative exists to armed defense. And what is more, "Upon

receiving the approval of the chief of police or superintendent . . . the application

is  then presented to a judge of the Superior Court . . . who 'shall issue' the permit after being satisfied that the applicant is qualified and has established a 'justifiable need' for carrying a handgun." *In re Permit to Carry a Handgun of Cheeseman*, 2018 WL 5831294 (App. Div. 2018).

47.    Under this Regulatory Scheme, both law enforcement and a judge are granted "the power to decide on a case-by-case basis whether the right is really worth insisting upon." *Heller*, 554 U.S. at 634.

48.    Moreover, even if an applicant does satisfy these criteria, the permit can *still* be denied on the basis of anything else leading the police chief in the first instance, or the Superior Court on review, to conclude that "issuance would not be in the interest of the public health, safety or welfare," N.J.S.A §§ 2C:58-3(c)(5), 2C:58-4(c), a plainly subjective standard.

49.    And even if obtained, because a carry permit is only good for two years, it must "be renewed . . . in the same manner and subject to the identical procedures by which the original permit was obtained." N.J.S.A. § 2C:58-4(a); *see also* N.J.A.C. § 13:54-2.9(a)-(b). Even in the case where an applicant successfully clears *all* of the legal hurdles, the permit will expire after two years. N.J.S.A. § 2C:58-4(a). The Sisyphean Rock that is the Regulatory Scheme will roll back down the mountain, and the applicant must once again set his or her shoulder to the boulder, all so that the State might—*if* it and its agents are so inclined—grant the

applicant the right once again to bear arms.

50.     On information and belief, due to the onerous nature of Defendants' Regulatory Scheme, only a tiny fraction of a percent of New Jersey citizens are able to obtain permits to carry handguns, and indeed, most people simply never apply at all because it is well known throughout the State that the "justifiable need" standard effectively renders the process an exercise in futility for all ordinary law-abiding citizens, thus further chilling and denying exercise of the right.

51.     Coupled with the requirements that the applicant must persuade three people to attest to his "good moral character and behavior", whatever that unconstrained and undefined term might mean, on a form filed with and investigated by law enforcement agencies, N.J.S.A. § 2C:58-4(b), and that an otherwise completely satisfactory application can be denied for any reason deemed somehow contrary to the interest of the public health, safety, or welfare, N.J.S.A. §§ 2C:58- 3(c)(5), 2C:58-4(c), the Regulatory Scheme grants Defendants essentially unbridled discretion to deny ordinary law-abiding citizens their right to carry a loaded, operable handgun in public.

52.     The Regulatory Scheme violates the constitutional rights of all such citizens, including Francisco and Katzin, the rights of all similarly situated members and supporters of FPC, and the rights of all other similarly situated individuals, under the Second and Fourteenth Amendments to the United States

Constitution.

## THE CONTROLLING CONSTITUTIONAL TEXT, AND THE HISTORY AND TRADITION THAT INFORMS IT

53.    The Second Amendment to the United States Constitution provides: "A well-regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed."

54.    The Fourteenth Amendment to the United States Constitution provides: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

55.    The Second Amendment is fully applicable to the States through the Fourteenth Amendment. *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010); *id.* at 805 (Thomas, J., concurring).

56.    "The very enumeration of the right [to keep and bear arms] takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *District of Columbia v. Heller*, 554 U.S. 570, 634 (2008).

57.    "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Id*. at 634-35.

58.     In *Heller*, the Supreme Court also held that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Heller*, 554 U.S. at 592.

59.     This is "'a natural right which the people have reserved to themselves, confirmed by the Bill of Rights,'" *Heller*, 554 U.S. at 594 (quoting A Journal of the Times: Mar. 17, New York Journal, Supp. 1, Apr. 13, 1769).

60.     And the meaning of the right during the founding era—which the Supreme Court has commanded must still control today—"unambiguously" "refer[red] to the carrying of weapons outside of an organized militia." *Id*. at 584. It is clear that, "[a]t the time of the founding, as now, to 'bear' meant to "carry." *Id*.

61.     *Heller* commands that the fundamental right to *bear* arms for self-defense—as part and parcel of "the natural right of resistance and self-preservation," *Heller*, 554 U.S. at 594—is of particular importance when it comes to ensuring citizens' ability to carry *handguns* for such purposes, because the court explicitly recognized the handgun as "the quintessential self-defense weapon" in this country, and that any prohibition against their carry and use by law-abiding persons is necessarily invalid. *Id.* at 629.

62.     Assuming applicants are not disqualified from exercising Second Amendment rights, the State must permit them to carry their loaded handguns in public in exercise of their right to bear arms.

63.     Consequently, this right to carry firearms, and particularly handguns, guaranteed under the Bill of Rights cannot be subjected to laws and regulations that prevent them from exercising that right, such as those "permitting" or "licensing" programs under which state authorities condition the exercise of this right based on subjective individual judgments of whether and the extent to which its exercise is in the interests of the public welfare, untethered to constitutional requirements and principles.

64.     Such regulatory schemes necessarily cannot operate to prohibit ordinary law-abiding citizens from carrying their handguns in public, and also prevent them from obtaining the "permit" necessary under state law to lawfully exercise the fundamental right to carry on their person loaded, operable handguns in public for self-defense—particularly when such schemes place these citizens under constant threat of criminal sanction for violating them.

65.     The enshrinement of the right to keep and bear arms in the Second Amendment has necessarily taken such "policy choices off the table." *Heller*, 554 U.S. at 636.

66.     Yet, this is precisely how the Regulatory Scheme in New Jersey operates, completely shutting out ordinary law-abiding citizens from exercising their rights in the State.

67.     The unconstitutional Regulatory Scheme starts out by making it a

crime to carry a loaded, operable handgun virtually anywhere outside a person's home or place of business, without first applying for and obtaining a permit to do so. Violators are subject to imprisonment for five to ten years and up to a $150,000 fine. N.J.S.A. §§ 2C:43-3(a)(2), 2C:43-6(a)(2).

68.     The Regulatory Scheme creates only a very narrow set of exceptions from this general criminal liability, reserved for specifically defined classes of individuals with special credentials or qualifications.

69.     Because the ordinary law-abiding citizen does not fall within any of these special classes, obtaining a carry permit the only way they can exercise the constitutionally guaranteed carry rights without being subjected to criminal sanction under the general prohibition.

70.     And then, the ordinary citizen who attempts to embark on the onerous carry permit process is cut off at the pass by the State's "justifiable need" standard, which is inherently designed to exclude any applicant who seeks a permit for the general purpose of exercising the fundamental right to keep and bear arms, as they are *guaranteed* by the Second Amendment.

71.     In fact, the standard is so onerous that is essentially designed to exclude anyone and everyone who cannot demonstrate a standard for the carry permit that is impossible to meet for the average citizen, based on demonstrable history and continuing existence of threats of great bodily injury or death.

72.    More than that, even if an applicant *might* somehow surmount this hurdle, their application will still be denied if the applicant fails to obtain and provide signed affirmations of three people attesting to his or her "good moral character and behavior," whatever that might mean.

73.    And that's not all. Under the Regulatory Scheme, the government retains unbridled discretion to deny an otherwise completely satisfactory application if, for any reason, the decision-making authorities conclude that issuing a permit "would not be in the interest of the public health, safety or welfare." Heller mandates that the constitutionality of restrictions on the rights enshrined in the Second Amendment must be scrutinized under the text of the Constitution itself, looking to history and tradition to inform its original public meaning.

74.    The Supreme Court has directed the analysis be "guided by the principle that '[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning.'" *Heller*, 554 U.S. at 576 (quoting *United States v. Sprague*, 282 U.S. 716, 731). And the Court looks to "the historical background of the Second Amendment" because "it has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a pre-existing right." *Id.* at 592.

75.    No laws requiring government permission for American citizens to

carry a firearm existed before the twentieth century—including at the time of the ratification of the Second Amendment in 1791.

76.     And indeed, the earliest laws that precluded the keeping and bearing of arms were indisputably unconstitutional, as they were the product of racist views long since abandoned as antithetical to the core purposes of the rights guaranteed all citizens under the Constitution.

77.     As the high court declared in *Brown v. Board of Ed.,* 347 U.S. 483, 491n. 5 (1954) (quoting *In re Slaughter-House Cases*, 83 U.S. (16 Wall.) 36, 67-72 (1873)):

> [The Fourteenth Amendment] 'ordains that no State shall deprive any person of life, liberty, or property, without due process of law, or deny to any person within its jurisdiction the equal protection of the laws. What is this but declaring that the law in the States shall be the same for the black as for the white; that all persons, whether colored or white, shall stand equal before the laws of the States, and, in regard to the colored race, for whose protection the amendment was primarily designed, that no discrimination shall be made against them by law because of their color? The words of the amendment, it is true, are prohibitory, but they contain a necessary implication of a positive immunity, or right, most valuable to the colored race,— the right to exemption from unfriendly legislation against them distinctively as colored,—exemption from legal discriminations, implying inferiority in civil society, lessening the security of their enjoyment of the rights which others enjoy, and discriminations which are steps towards reducing them to the condition of a subject race.'

78.     When the Supreme Court of North Carolina upheld the "Act to prevent Free Persons of Colour from carrying Fire-arms" in 1844, its opinion was based on

the now clearly untenable rationale that "Free people of color in this State are not to  be considered as citizens, in the largest sense of the term, or, if they are, they occupy  such a position in society, as justifies the legislature in adopting a course of policy in its acts peculiar to them—so that they do not violate those great principles of justice, which lie at the foundation of all laws." *State v. Newsom*, 27 N.C. 250 (1844).

79.    New Jersey's Regulatory Scheme is more burdensome to the Second Amendment right to bear arms than any historical law that has ever been applied to any person recognized as having full citizenship rights.

## FACTUAL ALLEGATIONS

### A. Facts Relating to Francisco

80.    Francisco meets all the general eligibility requirements for lawful  and proper handgun possession and use, including those required under New Jersey law for the issuance of a permit to carry a handgun.  Moreover, Francisco is an elected official—a duly elected member of the Englishtown Borough Council and, as part of his official Council duties, is a member of the Englishtown Borough Police Committee.

81.    On October 24, 2020, Francisco successfully completed a NRA 10-hour Basic CCW Course taught by certified instructor Rocco P. LaRocca II, which taught the following lessons, as reflected in a Certificate awarded to Francisco:

"Firearm Safety, Basic Defensive Pistol Skills, Drawing from Concealment, Loading and Stoppage Remediation, Mindset, Carry Modes and Pistol Concealment."

82.    On November 4, 2020, Francisco submitted a completed State of New Jersey Application For Permit To Carry A Handgun, form S.P. 642 (Rev. 03/15) to then-Detective Sergeant Alex Dinicola ("Dinicola") at EPD headquarters. At all times relevant to this action, Dinicola was and still is an employee of EPD acting under the direction and supervision of Cooke.

83.    Francisco's application included the endorsement of three reputable persons who had known him for at least three years and who certified that  he is a person of "good moral character and behavior," in accordance with the statutory requirements, as well as evidence of the certification necessary to demonstrate sufficient familiarity with the safe handling and use of handguns, as further required under state law. N.J.S.A. § 2C:58-4(b); N.J.A.C. §§ 13:54-2.3(a), 13:54-2.4(a).

84.    Francisco also included with his application a required "Letter of Need" in order to attempt to satisfy the statutory "justifiable need" standard. His statement provided as follows:

> I wish to carry a loaded, operable handgun on my person for self-defense and for all other lawful purposes outside my home and in other public places.

85.    Nonetheless, Dinicola refused to accept and process Francisco's

application, asserting that the NJSP Manual called for additional documents beyond what is listed on the NJSP website.  Accordingly, Dinicola refused to accept and process Francisco's application until Francisco provided a list of all handguns (with serial numbers) that Francisco intended to carry if granted a carry permit, and an official score sheet from the instructor who administered Francisco's practical shooting test.  Both of these demands were entirely extralegal and improper, as they are not enumerated in any statute or listed in any publicly available materials issued by the NJSP or the OAG.

86.    Notably, the NJSP Manual is an internal policy manual unavailable to the public, and the NJSP has fought vigorously to maintain the secrecy of the Manual.

87.    As to both of these extralegal, non-published "requirements," Francisco asked Dinicola if there was an official form Francisco should use and whether signatures were required, to which Dinicola replied "I don't know. This is just what the Manual says." Francisco asked to view the NJSP Manual, but Dinicola refused.

88.    On November 6, 2020, Francisco returned to EPD headquarters with the additional paperwork required by Dinicola; this time, Dinicola accepted and processed Francisco's application.

89.    Over the next two months, Francisco attempted to communicate with Dinicola by email, but received no response.  Francisco did see Dinicola on two

occasions at the Englishtown municipal building when Francisco attended the Borough Council's monthly meetings.  Both times, Dinicola assured Francisco that the application was "almost done."

90.    However, even after 60 days had passed, meaning that the application would be deemed approved by operation of law (N.J.S.A. § 2C:58-4(c)), Francisco had still not received any indication from Dinicola as to the status of the application. Finally, in early January, 2021, only after Francisco contacted Cooke, Dinicola emailed Francisco and claimed that Francisco had neglected to put his name on one page of the application, and that the entire application would have to be resubmitted. In fact, this error was the result of the NJSP's defective application PDF, which contained a PDF field that automatically deleted the name of the applicant when the PDF was printed.

91.    Also in or about early January, 2021, Cooke called Francisco and indicated that, contrary to Dinicola's assertions, Francisco's application was actually in proper order. However, Cooke then called Francisco back and said, in sum and substance: "We have good news and bad news. The good news is our application is fine. The bad news is the Detective neglected to tell you that you actually need to redo your fingerprints again brand new for this application"

92.    Cooke's demand that Francisco redo his fingerprints was strange, considering that EPD and NJSP already had Francisco's fingerprints on file from

previous firearm applications. Nonetheless, Francisco complied with Cooke's demand.

93.     Despite Francisco's clear right to exercise his constitutional right to keep and bear arms for self-defense, on January 18, 2021, Cooke met with Francisco at EPD headquarters and informed Francisco that his application was denied due to lack of justifiable need.

94.      By letter dated January 19, 2021, Cooke wrote to Francisco to confirm the denial of the application, writing *inter alia*:

> Your application for a Permit to Carry a Handgun is denied. The background investigation found a lack of justifiable need for you to be issued a permit to carry a handgun . . . . As discussed this denial is based  on the following: 1) Your notarized certification (letter) of need failed to specify in detail the urgency evidenced by specific threats or previous attacks which demonstrate a specific danger to your life that cannot be avoided by means other than by issuance of a permit to carry a handgun as established through case law . . . .

95.     By letter dated January 25, 2021 to Monmouth County Superior Court, Francisco, *pro se*, timely requested an appeal hearing. Francisco's appeal was captioned *State of New Jersey*, Plaintiff v. *Daniel Francisco*, Defendant, Docket No. GPA-MON-004-21.

96.     In a letter brief opposing Francisco's appeal dated May 10, 2021 and submitted to the Court, the Office of the Monmouth County Prosecutor, citing N.J.S.A. § 2C:58-4(d), conceded that Francisco met the requirement of good

character, that he was not subject to any of the disabilities set forth in subsection c. of N.J.S.A. § 2C:58-3, and that he was thoroughly familiar with the safe handling and use of handguns, writing that: "The State accepts that the Applicant appears to meet the first parts of that requirement."

97.     However, the Prosecutor argued that Francisco failed to meet the "justifiable need" requirement within the statutory meaning of N.J.S.A. § 2C:58-4(d).

98.     In a response letter submitted to the Court and dated June 18, 2021, Francisco wrote, *inter alia*:

> I concede that I do not meet the requirements of justifiable need within the statutory meaning of NJSA 2c:58-4(d) and within the meaning of New Jersey case law interpreting the 'justifiable need' requirement.  However, as I am a law-abiding citizen of good character who is not otherwise disqualified from obtaining a permit to carry a firearm, and thoroughly familiar with the safe handling and use of handguns, I desire to have the ability to legally carry a firearm in public in New Jersey for the purpose of self-defense.

99.      On July 2, 2021, a hearing on Francisco's appeal was conducted in the Superior Court of New Jersey Law Division, Criminal Part, Monmouth County, before Judge Lucas.

100.     During the hearing, Francisco, *pro se*, once again conceded, in his opening statement that he did not meet the "justifiable need" requirement, but that he desired to obtain a Carry Permit for the purpose of self-defense:

> As I said in my reply - - the letter brief, that I've met all the statutory requirements for the permit, except for an exclusively justifiable need.  I can see that that is correct and I just still humbly request the permit to carry, despite that.

101.    Following testimony by Francisco and Cooke, Judge Lucas stated, *inter alia*:

> It is clear from a review of the application and the testimony here, and the State does not contest this, that the appellant in this case, Mr. Francisco, meets - - meets the statutory requirements to the extent that there are no disabilities - - no statutory disabilities - - no statutory disabilities, as Chief Cooke indicated here.  It appears of good - - of moral character, particularly a review of the background check certainly reveals that.

102.    As to the issue of justifiable need, though, Judge Lucas stated, *inter alia*:

> As the State points out in their brief, the standard of justifiable need is a  high bar and not one that is easily met. There are very specific circumstances that have to be established in order to for the Court to find that there is a justifiable need.

103.    Judge Lucas acknowledged that:

> . . . he [Francisco] does wish to carry the handgun for self-defense and certainly the Court can understand that.  Certainly the Court can understand the desire to feel protected and to have the ability to defend oneself.

104.    However, despite acknowledging that the basic desire to defend oneself is normal, Judge Lucas, constrained by New Jersey's unconstitutional "justifiable need" requirement, found that "[t]he facts set forth . . . do not support a justifiable need . . . . "  Judge Lucas elaborated: "The Court is, though, constrained

by the statute, which, as the appellant here acknowledges, requires a justifiable need
. . . ."

105.   Accordingly, on the record, Judge Lucas denied the appeal and
sustained Cooke's denial of Francisco's application.  This denial was memorialized
in an "Order Denying Appeal" dated July 2, 2021, stating, *inter alia*: "ORDERED
that the [sic] DANIEL FRANCISCO'S appeal of the denial of his application to
obtain a permit to carry a firearm is hereby denied for the reasons set forth on the
record on today's date, July 2, 2021 . . . ."  (Bold in original removed).

106.   At the present time, Francisco still intends and desires to exercise his
right to keep and bear arms by carrying on his person a loaded, operable handgun
for lawful purposes, including self-defense, outside his home.

**B. Facts Relating to Katzin**

107.   Katzin meets all the general eligibility requirements for lawful and
proper handgun possession and use, including those required under New Jersey law
for the issuance of a permit to carry a handgun.  Moreover, Katzin is a former
member of the IDF and has received extensive civilian and military training in the
safe and proper use of firearms.

108.   At all times relevant to this action, Katzin, who resides in Oradell, New
Jersey, also co-owned, and still co-owns, a custom drape and shade business in
Hackensack, New Jersey, known as Interior Art & Design, Inc., together with Ronit.

The neighboring commercial property in Hackensack was and still is owned or operated by an individual named Bashar Sabbagh ("Sabbagh"), who, upon information and belief, also resides at this neighboring property.

109.   Prior to March 30, 2017, over a period of approximately 24 years, Sabbagh, who upon information and belief bears animus toward Katzin and Ronit at least in part because of their Israeli heritage, had engaged in a hostile course of conduct against Katzin, Ronit, and their employees, including intimidation, menacing, and threats, which put Katzin in legitimate fear for his and Ronit's safety. Sabbagh's hostile course of conduct during this period of over two decades has included, among other anti-social acts, Sabbagh spitting in Katzin's face and Sabbagh using a snowplow to dent Katzin's truck.

110.   In addition, at all relevant times, Katzin and Ronit rented and owned properties adjacent to and across the street from Sabbagh's building. Given Katzin's heavy investment in this area, he was unable to move away from Sabbagh and required a reasonable means of self-defense, to wit: a handgun, as is his constitutional right.

111.   On March 30, 2017, Sabbagh, escalating his relentless campaign of hostility, struck Katzin with an approximately seven-ton truck, for no legitimate or legal purpose and without any justification whatsoever, while Katzin was standing on his business property.  The incident was captured on video surveillance footage.

112.   By letter dated August 23, 2017, the Office of the County Prosecutor, County of Bergen, informed Katzin that the Bergen County Grand Jury had indicted Sabbagh for the March 30, 2017 incident on charges of "Aggravated Assault-Attempt/Cause Bodily Injury W/Deadly Weapon."

113.   Sabbagh's criminal case was assigned to Judge Kazlau.

114.   As set forth in a "Judgment of Conviction" dated October 12, 2018 and signed by Judge Kazlau, Judge Kazlau found Sabbagh guilty of "Simple Assault-Threat of SBI By Physical Menace" at trial on September 27, 2018; and, on October 5, 2018, Judge Kazlau sentenced Sabbagh to 3 years of probation with a 90-day suspended jail sentence, 100 hours of community service, a six-month suspension of Sabbagh's driver's license, and restitution to Katzin. Judge Kazlau also imposed a "no contact order" requiring Sabbagh to have no contact with Katzin and Ronit. Moreover, Judge Kazlau found that there were several "aggravating factors," including "[t]he risk that the defendant will commit another offense" and "[t]he extent of the defendant's prior criminal record and the seriousness of the offenses of which he/she has been convicted."

115.   Indeed, this incident was not Sabbagh's first contact with the criminal justice system.  In 2005, also after trial, he was convicted of third-degree attempt to cause significant bodily injury, third-degree aggravated assault with a deadly weapon, and fourth-degree criminal mischief, and sentenced to three concurrent

five-year terms of probation. *State v. Sabbagh*, 2005 N.J. Super. Unpub. LEXIS 427 (App. Div. 2005). The 2005 incident also involved Sabbagh using a motor vehicle as a weapon. *Id*.

116. Even after Sabbagh's indictment and conviction, and even with a no contact order in place, he continued to intimidate Katzin and his Ronit, by, among other acts, driving slowly past Katzin's business while playing extremely loud music.

117. On December 10, 2017, Katzin successfully completed an NRA "Basics of Pistol Shooting" course taught by NRA-certified instructor James M. Gremmenos ("Gremmenos").

118. On March 22, 2018, Katzin earned the "6 Star Ballistic Achievement Certification" for having attended, completed, and excelled at the "Holster Draw" Gun For Hire training course, also taught by Gremmenos.

119. On April 22, 2018, Katzin successfully completed an NRA comprehensive pistol qualification course taught by Charles F. Padula, NRA-certified firearms instructor, consisting of 50 rounds fired in a timed fire sequence drill at 7, 10, 15, and 25 yards at an official NRA target. The course "also consisted of an in depth lesson on the judicious use of deadly force and its basic principles and legal ramifications," as reflected in the certificate earned by Katzin for completion of this course.

120.   On April 28, 2018, Katzin further earned the "6 Star Ballistic Achievement Certification" for having attended, completed, and excelled at the "Urban Pistol I" Gun For Hire training course, also taught by Gremmenos.

121.   In March, 2018, Katzin submitted a completed State of New Jersey Application For Permit To Carry A Handgun, form S.P. 642 (Rev. 03/15) to OPD, together with all other required application materials.

122.   Katzin's application included the endorsement of three reputable persons who had known him for at least three years and who certified that he is a person of "good moral character and behavior," in accordance with the statutory requirements, as well as evidence of the certification necessary to demonstrate sufficient familiarity with the safe handling and use of handguns, as further required under state law. N.J.S.A. § 2C:58-4(b); N.J.A.C. §§ 13:54-2.3(a), 13:54-2.4(a).

123.   Katzin also included with his application a required "Letter of Need" dated March, 28 2018 and addressed to the Superior Court in order to attempt to satisfy the statutory "justifiable need" standard. His Letter provided as follows:

> I am writing to you to request that I be granted a permit to carry a handgun in the State of New Jersey because I believe that I am under substantial threat of unjustifiable serious bodily harm. On March 30, 2017, I became a victim of Aggravated Assault – Attempt to Cause Bodily Injury with a Deadly Weapon (Docket Number: 17000553; Indictment Number 17-08-1119-1; see attached grand jury indictment letter), when Mr. Bashar Sabbagh, who has the adjacent business to me for the past 24 years, attempted to run me over with his seven-ton truck while

I was on my business property (surveillance video available). This was just one of the many hostile incidents that Mr. Sabbagh has inflicted on me, my employees, my property and my personal vehicles in the past 24 years for reasons unknown.

I already rent and own properties that are adjacent and across the street from Mr. Sabbagh's building and I am heavily invested in those properties. Therefore, in the foreseeable future I am in a position of not being able to move away, and I am forced to remain in his proximity and "constantly looking over my shoulder" due to the history of specific threats and the attack demonstrating a special danger to my life that cannot be avoided by other means.

Based on this situation, I have an urgent necessity for self-protection, and I believe that carrying of a handgun is necessary to reduce the threat of unjustifiable serious bodily harm to myself.

124.    Despite Katzin's clear need to exercise his constitutional right to keep and bear arms for self-defense, by letter dated May 3, 2018, Wicker wrote to Katzin to confirm the denial of the application, writing *inter alia*:

This letter is to inform you that your application for a New Jersey Application for Permit to Carry a Handgun has been DENIED by Chief William Wicker for the following reason/s:

Lack of Justifiable Need

2c:58-4(c) Requires that the applicant must demonstrate a justifiable need to carry a handgun. After a thorough review of your application, as well as the police reports and surveillance video associated with the Aggravated Assault that took place on 3/30/2017, Chief Wicker has deemed that your request to carry a handgun does not meet the justifiable need criteria outlined in 2C:58-4(c).

(Bold in original removed).

125.    Thereafter, Katzin, *pro se*, timely requested an appeal hearing to the Bergen County Superior Court.  Katzin's appeal was captioned *In the Matter of Ori Katzin Regarding His Application For a Permit to Carry a Handgun*, Docket No. GM-2018-40.

126.    On August 2, 2019, a hearing on Katzin's appeal was conducted in the Superior Court of New Jersey Law Division, Bergen County, before Judge Kazlau.  Katzin was represented by Frank Pisano, III, Esq. Despite the clear and obvious evidence of Katzin's justifiable need for a carry permit, and despite Judge's Kazlau's familiarity with the danger presented by Sabbagh to Katzin and Ronit and Judge Kazlau's previous finding of aggravating factors in Sabbagh's criminal case, Judge Kazlau found that Katzin failed to meet the unconstitutional and virtually-insurmountable justifiable need standard.

127.    Moreover, Judge Kazlau also rejected Pisano's request for a modified carry permit that would have allowed Katzin to carry a handgun from his residence in Oradell to his business in Hackensack, and back.

128.    Accordingly, in an Order dated August 5, 2019, Judge Kazlau wrote, *inter alia*: "ORDERED that Ori Katzin's application for a permit to carry a handgun is hereby DENIED based upon lack of justifiable need . . . ." (Bold in original removed).

129.    At the present time, Katzin still intends and desires to exercise his right

to keep and bear arms by carrying on his person a loaded, operable handgun for lawful purposes, including self-defense, outside his home and business, and would do so but for the unconstitutional Regulatory Scheme.

### C.  Additional Facts Relating to FPC and its Members and Supporters

130.    FPC has members and supporters in New Jersey, including Plaintiffs Francisco and Katzin, who intend and desire to exercise their right to keep and bear arms by carrying on their person a loaded, operable handgun for lawful purposes, including self- defense, outside their homes.

131.  But for New Jersey's unconstitutional Regulatory Scheme, the Defendants' enforcement thereof, and the severe lifelong and criminal penalties associated with violations of the Regulatory Scheme, Plaintiffs Francisco and Katzin, Plaintiff FPC and its members and supporters, and other similarly situated individuals in New Jersey, would exercise their right to keep and bear arms  by carrying on their person a loaded, operable handgun for lawful purposes, including self-defense, outside their homes, without the fear or risk of arrest and prosecution, and the loss of their right to keep and bear arms for engaging in constitutionally protected conduct.

### THE STATE OF NEW JERSEY'S IMPERMISSIBLE INFRINGEMENT OF THE  FUNDAMENTAL INDIVIDUAL RIGHT TO BEAR ARMS

132.  As detailed above, nothing in the text itself, nor in the applicable history or tradition, of the Second Amendment supports the restrictions and burdens

that the  Regulatory Scheme imposes on law-abiding citizens, like Francisco and Katzin, and FPC's members and supporters, and their right to lawfully and peaceably carry loaded handguns for all lawful purposes, including self-defense, in the exercise of their fundamental right to bear arms.

133.   Indeed, nothing in that historical background even justifies the *preliminary* requirement that ordinary law-abiding citizens must obtain a permit— through an already onerous scheme that tests their "good character and good repute in the community"—before they can even *purchase or acquire* a handgun in the first place. *See* N.J.A.C. § 13:54-1.3(b)-(c); N.J.S.A. § 2C:58-3(c).[5]

134.   It makes a mockery of the fundamental right to keep and bear arms under the Second Amendment to require that ordinary citizens apply for a permission slip from State agents to carry the handgun which they already had to jump through hoops to acquire, and then to grant those same State agents essentially unimpeachable discretion to deny that permission whenever they find, in their subjective judgment, an insufficient "justifiable need," that the applicant has not proven "good moral character and behavior," or that issuing the permit is otherwise contrary to some "interest of the public health, safety and welfare."

135.   The Regulatory Scheme flips on their head the constitutionally

---

[5] While Plaintiffs maintain that the firearm purchase permitting scheme is constitutionally infirm for many of the same reasons as the handgun permitting scheme, this action focuses on the constitutional infirmity of the latter scheme.

guaranteed exercise of rights and the presumption of liberty secured by the Second Amendment, in banning otherwise eligible, law-abiding citizens from freely carrying loaded handguns in public on pain of criminal liability, and then leaving them with slim chances of ever lawfully exercising this right under the oppressive Regulatory Scheme.

136.   And the Regulatory Scheme leaves ordinary citizens with no realistic opportunity at all because they cannot prove that they have, at the time of their application, "an urgent necessity . . . for self-protection based on specific threats or previous attacks demonstrating a special danger to the applicant's life that cannot be avoided by other means." *In re Wheeler*, 433 N.J. Super. at 571-72.

137.   The Regulatory Scheme's handgun carry permit application and issuance requirements, process, and standards are the very definition of unconstitutional, loaded with built-in arbitrary and capricious terms and opportunities for the exercise of unbridled subjective discretion all along the path of its burdensome journey to a virtually certain denial.

138.   Francisco and Katzin are ordinary law-abiding citizens who meet all the general eligibility requirements for a handgun carry permit—with a clean criminal record; no mental, physical, or legal disabilities concerning his right or ability to lawfully possess and use handguns; no associations with any subversive groups; having the endorsement of three individuals attesting to his "good moral

character and behavior;" and demonstrated sufficient familiarity with the safe use and handling of firearms.

139.   Francisco and Katzin completed and submitted to the police chiefs in their respective boroughs the standard application for requesting the issuance of a handgun carry permit, which included all the required certifications, attestations, and other required documentation, as well as a supporting statement of "justifiable need."

140.   Nevertheless, Francisco and Katzin were denied a carry permit for lack of a "justifiable need."

141.   The very design of the Regulatory Scheme forces this result for ordinary law-abiding applicants like Francisco and Katzin who seek to carry a handgun in the exercise of their constitutional right to self-defense.

142.   Francisco's assertions in support of his application are necessarily insufficient as a matter of law in New Jersey.  Katzin's assertions in support of his application should have been sufficient, but apparently, even a deranged neighbor striking an applicant with a truck together with a history of animus and malice is insufficient grounds for a Court to issue a carry permit in New Jersey.

143.   Francisco, Katzin, and those similarly situated cannot—and, under the Constitution, cannot be required to— show they have "an *urgent* necessity ... for self-protection based on *specific threats or previous attacks* demonstrating a special

danger to the applicant's life that cannot  be avoided by other means," *In re Wheeler*, 433 N.J. Super. at 571-72 (italics added)—much less *prove* with "reports of such incidents to the appropriate law enforcement agencies" that they are persistently or repeatedly experiencing such acute dangers. N.J.A.C. § 13:54-2.4(d)(1).

144.   The Regulatory Scheme demands proof that an applicant for a carry permit: 1) has already been confronted with a real threat of serious or deadly force, and 2) after that confrontation—if they survive it—continues to live under a persistent threat of immediate death or great bodily injury, and 3) the only conceivable means of combatting the threat is the carrying of a handgun. Only the survivors of real threats and injuries can hope to obtain a carry permit—and only after that additional time and carry permit process has elapsed could they hope to defend their lives with their handgun.

145.   When seconds count, the police are minute or hours away, if they come at all—and the Regulatory Scheme, and the Defendants' enforcement of it, disarms and leaves effectively defenseless the very same people the Constitution guarantees the right to keep and bear arms for self-defense.

146.   And certainly no one could obtain a carry permit with the supporting justification that they wish to carry a handgun in the lawful exercise of the constitutional right to self-defense while in the public domain. Although this is the

only justification that should and *constitutionally can* be required, their applications

are all doomed to fail under the Regulatory Scheme.

147.   Because a person's ability to acquire carry permit is the sole means of

carrying a handgun in public in the exercise of their constitutional rights without

facing criminal liability, prosecution, imprisonment, and the loss of rights *as a*

*consequence of exercising their rights*, the constitutional injury is complete even

before their applications are denied; the standard itself has cut them off at the pass,

precluding any possibility of their ever being granted the permit for so long as this

standard is in effect.

148.   Indeed, this not only renders any further hearings or appeals from a

denial following a hearing an exercise in futility, but it also means that all ordinary

law-abiding citizens disqualified under the Regulatory Scheme because they cannot

show a sufficient "justifiable need" stand constitutionally aggrieved regardless of

whether they have even applied, because to carry without a permit would violate

the  Regulatory Scheme's criminal provisions.

149.   As such, the Regulatory Scheme represents a continuing threat and

infringement upon the fundamental constitutional rights of Francisco and Katzin,

and a continuing threat and infringement upon the fundamental constitutional rights

of the similarly situated members and supporters of FPC and all similarly situated

individuals, including all those individuals otherwise qualified to obtain a handgun

carry permit but who have elected not to submit an application under the prevailing "justifiable need" and other  unconstitutional subjective standards in recognition of the reality that doing so would be a wasteful and futile effort.

150.   The application process in fact comes at a real cost—not only must the applicant gather and provide substantial information and documentation, including information of a highly personal nature, but the applicant must enlist three other people to attest to his or her "good moral character and behavior," pay a $50 fee, jump through many hoops, and wait weeks or months before they have their answer—an answer that, under the Regulatory Scheme, is almost certainly a denial of the right to carry.

151.   The costly and insurmountable conditions of the Regulatory Scheme's carry permit process and requirements have and continue to chill the exercise of the rights at stake from the very start of the onerous process, shunning law-abiding citizens before they have even attempted to apply.

152.   The Regulatory Scheme's carry permit requirements that all ordinary citizens "prove" their "good moral character and behavior" with the testimony of three other people heightens the chilling effect of the Regulatory Scheme. Many people who know the applicant well, are fully confident that he or she is a trustworthy law-abiding person, and who would otherwise happily opine the applicant is of "good moral character and behavior" in any other context, may be

hesitant to get directly involved in a firearms permitting scheme by ascribing their names on a form that will be scrutinized by government officials—especially given the public knowledge that these officials investigate such statements, sometimes with psychologically imposing face-to-face encounters with armed police, and almost invariably reject the applicants.

153.   Certainly, an applicant's "good moral character and behavior"—whatever that means—cannot fairly be impugned by his or her failure to procure such attestations, much less the failure to convince *three* individuals to voluntarily engage in such a process with law enforcement. Yet, that's one more unreasonable and unduly burdensome condition being imposed on the citizens' fundamental constitutional right to bear arms.

154.   The already unconstitutional restrictions and burdens imposed by the Regulatory Scheme are especially onerous now in light of the current public health crisis and the associated psychological and economic pressures increasing the potential of crime and civil unrest. Since the onset of the COVID-19 pandemic, violent crime and murders have increased in many metropolitan areas, including in New Jersey.[6]

---

[6] *See*, for instance: "Increase in gun violence seen throughout New Jersey"
https://www.njspotlight.com/news/video/increase-in-gun-violence-seen-throughout-new-jersey/ (last accessed November 1, 2020) and "Gun violence fuelsmurder rise in some cities even with coronavirus lockdowns"
https://www.foxnews.com/us/gun-violence-fuel-murder-rise-in-some-cities-even-in-the-middle-of-coronavirus-pandemic (last accessed November 1, 2020).

155.   Francisco and Katzin are accordingly even more concerned about their safety and the safety of their families, and they more than ever seek and desire to lawfully exercise their right to bear arms by carrying a loaded, operable handgun—"the quintessential self-defense weapon" in the United States—for lawful purposes including self-defense while outside the limited confines of their homes.

156.   Francisco and Katzin, who possess all of the qualifications necessary to obtain a handgun carry permit, and similarly situated members and supporters of FPC, intend to exercise their right to bear arms in the State of New Jersey by carrying a loaded, operable handgun in public, which would currently violate the State's unconstitutional Regulatory Scheme.

157.   On information and belief, Defendants individually and collectively enforce the Regulatory Scheme.

158.   The Regulatory Scheme, and Defendants' enforcement thereof, causes Plaintiffs Francisco and Katzin, and others like them to have a reasonable fear and creates an imminent risk   of arrest and criminal prosecution for carrying a handgun in violation of the Regulatory Scheme, and subjects them to criminal penalties, prosecution, prison, and the lifetime loss of their right to keep and bear arms.

159.   Francisco, Katzin, and similarly situated members and supporters of FPC, and similarly situated members of the public, would exercise their right to bear arms by carrying a loaded, operable handgun—"the quintessential self-defense

weapon" in the United States—for lawful purposes including self-defense while outside the limited confines of their homes but for the Regulatory Scheme and Defendants' enforcement thereof.

160.   Defendants are individually and collectively responsible for this deprivation of constitutional rights, acting under color of State law at all relevant times.

161.   Defendant Bruck enforces, oversees, directs, and implements the Regulatory Scheme in his capacity as Acting Attorney General. He is therefore responsible for administering and executing the laws and regulations underlying the Regulatory Scheme, which govern the carrying of firearms in public and which impose criminal sanctions for violations of that scheme, including the sanctions for carrying a handgun without first obtaining the permit necessary to avoid criminal liability.

162.   Under the general supervision and oversight of Bruck, Callahan in turn enforces, oversees, directs, and/or implements the Regulatory Scheme in his capacity as Superintendent of the NJSP.  His State Police have issued regulations further implementing the statutory requirements governing Handgun Carry Permits. N.J.A.C. § 13:54- 2.1, *et seq*.  Those regulations provide that "in the case of a private citizen," the "justifiable need" requirement is satisfied only if the applicant can "specify in detail the urgent necessity for self-protection, as

evidenced by serious threats, specific threats, or previous attacks, which demonstrate a special danger to the applicant's life that cannot be avoided by reasonable means other than by issuance of a permit to carry a handgun." *Id*. § 13:54-2.4(d)(1). Those regulations further provide that "[w]here possible the applicant shall corroborate the  existence of any specific threats or previous attacks by reference to reports of such incidents to the appropriate law enforcement agencies . . . ." *Id*.  He is therefore responsible for administering and executing the laws and regulations underlying the Regulatory Scheme, which govern the carrying of firearms in public and impose criminal sanctions for violations of that scheme, including the sanctions for carrying a handgun without first obtaining the permit necessary to avoid criminal liability. He is also responsible for directly administering and rendering determinations on the handgun carry permit applications of those who must or choose to apply to him.

163.    Defendant Cooke enforces, oversees, directs, and/or implements the Regulatory Scheme in his official capacity. He is therefore responsible for administering and executing the laws and regulations underlying the Regulatory Scheme, which govern the carrying of firearms in public and impose criminal sanctions for violations of that scheme, including the sanctions for carrying a handgun without first obtaining the permit necessary to avoid criminal liability. He is also responsible for directly administering and rendering determinations on the

applications of the residents in Englishtown seeking handgun carry permits, including the enforcement and implementation of the "justifiable need" requirement, and has and continues to deny applicants who cannot meet the Regulatory Scheme's unconstitutional standards and requirements. In so doing, Cooke is enforcing, implementing, promoting, and propagating the laws and related regulations, policies, or customs which are the direct and proximate cause of, and the driving force behind, the harm for which Plaintiffs seek redress through this action.

164.   Defendant Wicker enforces, oversees, directs, and/or implements the Regulatory Scheme in his official capacity. He is therefore responsible for administering and executing the laws and regulations underlying the Regulatory Scheme, which govern the carrying of firearms in public and impose criminal sanctions for violations of that scheme, including the sanctions for carrying a handgun without first obtaining the permit necessary to avoid criminal liability. He is also responsible for directly administering and rendering determinations on the applications of the residents in Oradell seeking handgun carry permits, including the enforcement and implementation of the "justifiable need" requirement, and has and continues to deny applicants who cannot meet the Regulatory Scheme's unconstitutional standards and requirements. In so doing, Wicker is enforcing, implementing, promoting, and propagating the laws and related regulations,

policies, or customs which are the direct and proximate cause of, and the driving force behind, the harm for which Plaintiffs seek redress through this action.

165.   Defendants, Judge Lucas and Judge Kazlau, and other Superior Court judges assigned to carry permit cases, are also participants in furtherance of the Regulatory Scheme, in that they perform an administrative function more typical of law enforcement—making final and binding determinations about whether to approve or deny carry permits.

166.   In August 2021, amidst continuing and growing threats of civil unrest, violent protests that turn into riots, and increasing violent crime the People of New Jersey are disarmed and denied their rights under the Regulatory Scheme, forced to live as sitting ducks, without access to their right to bear arms outside of their homes.

167.   Accordingly, the Regulatory Scheme and Defendants' individual and collective enforcement of the same are unconstitutional and violate the right to bear arms for self-defense, and the privileges and immunities of citizenship, of Francisco and Katzin, the similarly situated members of FPC, and all other similarly situated individuals.

168.   Thus, Plaintiffs pray that this Court grant the requested relief.

## COUNT ONE

**Violation of the United States Constitution
Second and Fourteenth Amendments
(42 U.S.C. § 1983)
(All Plaintiffs against All Defendants)**

169.   Plaintiffs incorporate herein by reference the foregoing paragraphs as if  fully set forth herein.

170.   There is an actual and present controversy between the parties.

171.   The Second and Fourteenth Amendments to the United States Constitution guarantee adult citizens of states their fundamental right to keep and bear arms, both in the home and in public.

172.   The keeping and bearing of arms is a fundamental right that is necessary to our system of ordered liberty, and is additionally a privilege and immunity of citizenship, in both protected by the Fourteenth Amendment.

173.   The right to keep and bear arms includes, but is not limited to, the right of individuals to acquire and carry loaded, operable handguns on their person in public for all lawful purposes including self-defense, outside the confines of their homes, personal vehicles, and places of business.

174.   42 U.S.C. § 1983 creates a cause of action against state actors who deprive individuals of federal constitutional rights under color of state law.

175.   Defendants, individually and collectively, and under color of State law at all relevant times, have deprived the fundamental constitutional rights, privileges,

and immunities of citizenship of adult persons in the State of New Jersey, including Plaintiff Francisco's and Plaintiff Katzin's, all similarly situated members and supporters of FPC, and all other similarly situated individuals, through Defendants' enforcement and implementation of the Regulatory Scheme which has denied, will continue to deny and prevent by criminal sanction, the exercise of the fundamental right to bear arms in public for self-defense unless and until redressed through the relief Plaintiffs seek herein.

176.   The Regulatory Scheme and the statutory framework underpinning the Scheme, including but not limited to the "justifiable need" requirement of N.J.S.A. § 2C:58-4(c), burdens conduct protected by the Second Amendment and is categorically unconstitutional, both facially, and as-applied to Plaintiffs Francisco and Katzin. The Regulatory Scheme and the statutory framework underpinning the Scheme, including but not limited to the "justifiable need" requirement of N.J.S.A. § 2C:58-4(c), are at odds with the plain meaning and text of the Second Amendment, Supreme Court precedent, and the extensive American history and tradition of individuals keeping and bearing arms for self-defense and other lawful purposes, including but not limited to carriage of handguns outside the home.

177.   Even under a tiered scrutiny analysis, wherein strict scrutiny should apply, the Regulatory Scheme fails. And the Regulatory Scheme and the statutory framework underpinning the Scheme fails even intermediate scrutiny.

178.   The Regulatory Scheme and the statutory framework underpinning the Scheme, including but not limited to the "justifiable need" requirement of N.J.S.A. § 2C:58-4(c), are therefore unconstitutional, both facially, and as-applied to Plaintiffs Francisco and Katzin.

179.   For all the reasons asserted herein, Defendants have acted in violation of and continue to act in violation of 42 U.S.C. § 1983, compelling the relief Plaintiffs seek.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully pray for the following relief:

a.   A declaratory judgment that Plaintiffs Francisco and Katzin, similarly situated members of Plaintiff FPC, and all other  similarly situated individuals who are not prohibited from acquiring and possessing firearms under federal and state laws, have a fundamental right to bear arms, including by carrying loaded, operable, handguns, on their person and for all other lawful purposes including self-defense, inside and outside their homes, and in public, as guaranteed under the Second and Fourteenth Amendments to the United States Constitution;

b.   A declaratory judgment that the Regulatory Scheme and all related statutes, regulations, policies, and/or customs designed to enforce or implement the same, prevent Plaintiffs Francisco and Katzin, similarly

situated members of Plaintiff FPC, and all other similarly situated individuals from exercising their fundamental right to bear arms, including loaded, operable, handguns, on their person for self-defense, and for all other lawful purposes, inside and outside their homes, and in public, as guaranteed under the Second and Fourteenth Amendments to the United States Constitution;

c.     A declaratory judgment that requiring an application for a carry permit to be additionally presented to and approved by a judge of the New Jersey Superior Court where the applicant resides, or to the New Jersey Superior Court in any county where he or she intends to carry a handgun, in the case of a nonresident or employee of an armored car company, after it is already approved by the chief police officer or the Superintendent of the NJSP, is unconstitutional under the Second and Fourteenth Amendments to the United States Constitution;

d.     A declaratory judgment that the State's requirement of "written certification of justifiable need" is unconstitutional under the Second and Fourteenth Amendments to the United States Constitution, or alternatively, is unconstitutional to the extent it requires people to state, declare or otherwise show an urgent necessity (or any sort of special or heightened necessity) beyond their desire to exercise their right to armed self-defense;

e.     A preliminary and permanent injunction prohibiting each

Defendant, and each Defendant's respective employees, officers, agents, representatives, and all those acting in concert or participation with him or her, and all those who have notice of the injunction, from enforcing the Regulatory Scheme and all related regulations, policies, and/or customs designed to enforce or implement the same, against Plaintiffs Francisco and Katzin, similarly situated members of Plaintiff FPC, and all other similarly situated individuals not otherwise prohibited from acquiring and possessing firearms under federal and state laws, and thus allow them to exercise their fundamental right to keep and bear arms, including loaded, operable handguns, on their person for all lawful purposes, including self- defense, inside and outside their homes, and in public, as guaranteed under the Second and Fourteenth Amendments to the United States Constitution;

   f.  An order requiring Defendants and their respective employees, officers, and agents, and all those with such powers delegated to them, and all who have notice of the order, to issue a handgun carry permit to Plaintiffs Francisco and Katzin, to similarly situated members of Plaintiff FPC, and to other individuals upon application as long as they are not subject to any of the disabilities set forth in subsection c. of N.J.S.A. § 2C:58-3 and applicable federal laws, and attest or otherwise show familiarity in the safe handling and use of handguns, including at the time of application;

g.      Nominal and all other damages due Plaintiffs by Defendants to the extent permitted by law;

h.      Attorney's fees, expert fees, and costs to the extent permitted by 42 U.S.C. § 1988 and any other applicable law; and,

i.      Any and all other and further legal and equitable relief, including  injunctive relief, against Defendants and any others who may be subjected to the Court's jurisdiction, as necessary to effectuate the Court's judgment, or as the Court otherwise deems just and proper.

Dated: August 3, 2021                    Respectfully submitted,

By:   s/    Edward A. Paltzik
      Edward A. Paltzik, Esq.
      Joshpe Mooney Paltzik LLP
      1407 Broadway, Suite 4002
      New York, NY 10018
      Tel: (212) 344-8211
      epaltzik@jmpllp.com

      *Attorneys for Plaintiffs*